1
2
3
4
5
6
7        **UNITED STATES DISTRICT COURT**
8        **DISTRICT OF NEVADA**
9
10    JONATHAN COHAN, M.D.,
11          Plaintiff,                          Case No. 2:13-cv-00975-LDG (CWH)
12    v.                                        <u>ORDER</u>
13    PROVIDENT LIFE AND ACCIDENT
      INSURANCE CO., *et al.*,
14
            Defendants.
15
16

17        In his complaint, the plaintiff, Jonathan Cohan, M.D., alleges that he purchased a

18    disability insurance policy from defendant Provident Life and Accident Insurance Co., a

19    subsidiary of defendant Unum Group.  (For brevity, the Court will collectively refer to the

20    defendants as Unum.)  He further alleges in 2010 and 2011, his occupation was as a

21    pulmonary critical care physician.  He asserts that he became totally disabled from this

22    occupation as of June 27, 2011, and submitted a total disability claim.[1]  Unum initially paid

23    total disability payments to Cohan, but subsequently decided to terminate his benefits and

24    demand a repayment for the overpayment of benefits.  Cohan alleges claims for breach of

25    _____

26          [1]      Complaint, ¶30: "In response to Dr. [Cohan's] claim for benefits for total
      disability. . . ."

1  contract and bad faith against both defendants, and unfair trade practices against

2  Provident Life.

3  As to his claim for breach of contract, Cohan has moved for partial summary

4  judgment (#135) as to (a) the definition of the term "occupation," and (b) if a residual

5  disability calculation was appropriate, Unum made an incorrect calculation of his claim.

6  Unum has opposed the motion (#191).

7  Unum has moved for summary judgment as to Cohan's claims for breach of

8  contract, bad faith, and unfair trade practices or, alternatively, partial summary judgment on

9  specific issues concerning these claims (## 138, 217, 224), which Cohan has opposed

10  (#186, 231).  Cohan has also moved to strike (#190) certain exhibits that Unum filed in

11  support its motion for summary judgment, which Unum has opposed (#203).  Unum has

12  also moved to strike (#218) certain of Cohan's exhibits that he submitted in support of his

13  opposition to Unum's motion for summary judgment.[2]  As concerning the motions to strike,

14  the Court will address the arguments raised by the parties as necessary to resolve the

15  cross-motions for summary judgment.  Having considered the pleadings, papers, and

16  admissible exhibits, the Court will deny Cohan's motion for partial summary judgment, and

17  will grant Unum's motion as to Cohan's bad faith and unfair trade practices claims, and

18  deny the motion as to Cohan's claims for breach of contract.

19  Motion for Summary Judgment

20  In considering a motion for summary judgment, the court performs "the threshold

21  inquiry of determining whether there is the need for a trial—whether, in other words, there

22  are any genuine factual issues that properly can be resolved only by a finder of fact

23  because they may reasonably be resolved in favor of either party." *Anderson v. Liberty*

24

25  [2]  Unum also moved to strike (#194) Cohan's references to the medical

26  opinions of Dr. Thomas Peters.  The motion has been rendered moot and will be denied as such.

2

1   *Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir.

2   2012).  To succeed on a motion for summary judgment, the moving party must show (1)

3   the lack of a genuine issue of any material fact, and (2) that the court may grant judgment

4   as a matter of law.  Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

5   (1986); *Arango*, 670 F.3d at 992.

6        A material fact is one required to prove a basic element of a claim.  *Anderson,* 477

7   U.S. at 248.  The failure to show a fact essential to one element, however, "necessarily

8   renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  Additionally, "[t]he mere

9   existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."

10   *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting

11   *Anderson*, 477 U.S. at 252).

12        "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

13   adequate time for discovery and upon motion, against a party who fails to make a showing

14   sufficient to establish the existence of an element essential to that party's case, and on

15   which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  "Of

16   course, a party seeking summary judgment always bears the initial responsibility of

17   informing the district court of the basis for its motion, and identifying those portions of 'the

18   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

19   affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

20   fact."  *Id.*, at 323.  As such, when the non-moving party bears the initial burden of proving,

21   at trial, the claim or defense that the motion for summary judgment places in issue, the

22   moving party can meet its initial burden on summary judgment "by 'showing'–that is,

23   pointing out to the district court–that there is an absence of evidence to support the

24   nonmoving party's case."  *Id.,* at 325.  Conversely, when the burden of proof at trial rests

25   on the party moving for summary judgment, then in moving for summary judgment the

26   party must establish each element of its case.

1    Once the moving party meets its initial burden on summary judgment, the non-

2    moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro.

3    56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir.

4    2000).  As summary judgment allows a court "to isolate and dispose of factually

5    unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the

6    evidence before it "in the light most favorable to the opposing party."  *Adickes v. S. H.*

7    *Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however,

8    will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co.*

9    *v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot

10   "'rest upon the mere allegations or denials of [its] pleading' but must instead produce

11   evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"

12   *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed.

13   R. Civ. Pro. 56(e)).

14       <u>Factual Background</u>.

15       Cohan applied for and obtained an individual disability income insurance policy

16   from defendant Provident Life: Policy No. 06-337-5069835.  Pursuant to the policy, Unum

17   agreed to pay a monthly benefit of $12,500 to Cohan for a Total Disability.  The policy

18   further defined:

19       Total Disability or totally disabled means that due to Injuries or Sickness:

20       1.    you are not able to perform the substantial and material duties of your
                occupation; and

21

22       2.    you are receiving care by a Physician which is appropriate for the condition
                causing the disability.  We will waive this requirement when continued care
                would be of no benefit to you.

23

24       your [sic] occupation means the occupation (or occupations, if more than one) in
         which you are regularly engaged at the time you become disabled.

25       The policy also provided for a Residual Disability Benefit that would pay a portion of

26   the Total Disability benefit reflecting the loss of income in an insured's occupation resulting

4

from the disability.  The policy defined a Residual Disability to mean "that as a result of the same Injuries or Sickness: (1) you have a Loss of Monthly Income in your occupation of at least 20%. . . ."

In late June 2011, Cohan began experiencing severe gastrointestinal distress, which was eventually diagnosed as diverticulitis.  Cohan underwent procedures related to the diagnosis through June 22, 2012.  At his direction, Cohan's assistant submitted a long term disability claim signed by Cohan to Unum on August 31, 2011.  On the claim, Cohan identified his job title as "Medical Doctor," the nature of the business as "Pulmonary," his annual income as $211,850.00, the occupational duty as "Pulmonary Care," the hours spent each week as "40 plus," and described his duties as "Provide pulmonary care to patients. Drive to various hospitals to provide pulmonary care. Consult with colegues [sic]."

Attached to the claim form was a 2010 Form 1099 identifying "Pulmonary Associates, Inc." as the payer, and Cohan as the recipient, of $211,850.00 of non-employee compensation.

Though requested on the disability claim form, Cohan did not identify the name, title, and telephone number of a person to be contacted for additional information regarding his occupation.  Though requested on the disability claim form, Cohan did not answer whether he was self-employed (and the name of the employer), and did not answer whether he worked for another employer (and the name of the employer), nor whether he had any ownership interest in the business.

As part of its initial investigation of Cohan's claim, Unum sent a questionnaire to Pulmonary Associates regarding his employment.  Pulmonary Associates responded that Cohan had been employed as a physician from 1997 through April 1, 2009, at which time he began working as a "1099 Contractor."  Pulmonary Associates further represented to Unum that Cohan worked an average of "40+" hours per week, and that his salary in 2010

1   was $230,000.  Pulmonary Associates described Cohan's job as "See pulmonary + critical

2   care patients in a hospital settings [sic] for Pulmonary Associates, Inc."

3          Following Unum's initial investigation, it began paying total disability benefits to

4   Cohan consistent with the terms of the disability policy through March 12, 2012 (a date by

5   which Cohan had agreed he expected to return to work).  On March 6, 2012, Cohan

6   (through his assistant) informed Unum that he had been hospitalized in February, and

7   wished to claim additional benefits under his claim.  Unum reopened Cohan's disability

8   claim file.

9          An investigator hired by Unum met with Cohan on March 28, 2012.  Both Cohan and

10  Unum have attached a copy of the investigator's field report as exhibits to their respective

11  motions.  Cohan, however, has moved to strike Unum's exhibit, and Unum's reliance on the

12  exhibit, to the extent it reports Cohan's specific representations about his work history.  He

13  argues the representations are hearsay under Rule 802,[3] and that they do not fall within

14  any exception.

15         Unum responds that, pursuant to Rule 801(d)(2)(A), Cohan's statements are not

16  hearsay because they are the statements of an opposing party.  Unum implicitly recognizes

17  that the report, itself, is hearsay, but argues that it falls within the business record exception

18  under Rule 803(6).

19         In reply, Cohan argues that the field report contains the investigator's assertions, not

20  his, and that defendants have not established that he intended any alleged statement to be

21  an assertion.  He further argues that the field report does not qualify as a business record

22  because it lacks indicia of trustworthiness.  Specifically, he argues that he disagrees with

23

24

25  _____

26      [3]      Unless otherwise indicated, references to Rules are to the Federal Rules of
    Evidence.

6

1  some of the statements within the report, and because the report contains greater detail

2  than the investigator's notes of the interview.[4]

3      The report is hearsay, as it contains the investigator's out-of-court statements

4  regarding Cohan's statements to the investigator.  Cohan has not shown that the method

5  or circumstances of preparation indicate a lack of trustworthiness.  The report is admissible

6  as a record of a regularly conducted activity.  Cohan's statements within the report are not

7  hearsay as Cohan is an opposing party.  The Court will deny Cohan's request to strike

8  Unum's submission of the report as an exhibit.

9      Cohan represented to the investigator "his prior earnings of $230,000 per year."  He

10  also indicated he was a "pulmonary critical care physician," and in that occupation was

11  "walking and standing on his feet for 10 to 12 hours daily," and had stopped working for

12  Pulmonary Associates in March 2011.  Prior to that time, he stated "he saw about 30 to 40

13  patients per day and about 150 patients per week," that "his normal work schedule was

14  sevens days a week, 10 to 12 hours daily and working on average two weekends a month."

15  He further indicated he "covered all other physicians' shifts when they were on days off or

16  on vacation, which caused him to work 30 days straight without a day off on occasion."

17      Cohan also represented to the investigator that he was listed as a medical director

18  for his wife's business, Vaccine Center Clinic, but that "technically he is not currently

19  employed as he is not drawing any type of salary."  He indicated he was helping his wife in

20  getting her business off the ground, that he was completing this work prior to his current

21  medical condition and his duties had not changed.  He further described his duties, and

22  further indicated that after March 30, 2012, he would begin working two half-days at the

23  clinic each week.

24  ————————————

25      [4]    While Cohan also argues that certain of his statements within the report are
   admissible for the purpose of showing notice to Unum, his arguments within his motion
26  indicate that he is relying on his statements, as reported to the investigator, for the truth of
   the matter being asserted.

7

Cohan submitted his personal tax returns for the years 2009-2011.  Each of the returns included several Schedule C forms reporting "Profit or Loss From Business."  The 2009 tax return included a Schedule C for the principal business or profession of "Healthcare," a Schedule C for "Marketing" under the business name "Ignite," and a Schedule C for "Administration and Management" under the business name "Omni."  Cohan reported, on each Schedule C, that he "materially participated" in the operation of each business.  The 2010 tax return included a Schedule C for the principal business or profession"Marketing" under the business name "Ignite," and a Schedule C for "Administration and Management" under the business name "Omni."  Cohan reported, on each Schedule C, that he "materially participated" in the operation of each business.  The 2010 tax return did not include a Schedule C reporting income from Cohan's business or profession of "Healthcare."  The 2011 tax return included a Schedule C for the principal business or profession of "Medical Health, Healthcare" under the business name Jonathan Cohan, and a Schedule C for "Asset Management, Management" under the business name "Omni."  Cohan reported, on each Schedule C, that he "materially participated" in the operation of each business.

In May 2012, Unum performed an "Earnings Analysis" concerning Cohan's income, relying upon Cohan's 2009-2011 income tax returns.  Reflecting the Schedule C forms that Cohan submitted with his tax returns, the analysis reported income from "Healthcare," "Marketing (Ignite)," and "Admin & Mgmt (Omni)."  For the year 2010, the analysis noted that a Schedule C for income from healthcare was not filed.  The analysis recognized that other financial information existed that was not relied upon in determining Cohan's income. In determining income, the analysis excluded losses reported on Schedule E forms for Bulls & Bears Trust from the gross receipts received from real estate.  In a section titled "Key Observations," a notation was made that the "Field Service Report" indicated "$230K per year in prior earnings."  The notation further noted "Unum did receive a 2010 1099-

MISC from the insured previously which listed the non-employee compensation of $211,850." A recommendation was made to "request a written statement from the insured clarifying how the income received from Pulmonary Assoc in 2010 as the 1099-MISC form indicates $211,850 in non-employee compensation and the total gross receipts reported from all his Schedule C businesses only total $156,485."

In June 2012, Cohan responded to a letter from Unum. In the letter, Cohan stated that "most things in [Unum's] correspondence are factually incorrect or only partially accurate." He clarified that he only assumed some duties of Medical Director in late October 2011, and that he did not receive any actual income or payment from the Vaccine Center prior to March 2012 (at which time he began receiving a monthly income of $12,000). He further asserted he did not receive most of his monthly income during the period 2009-2011 from real estate investments, noting the losses suffered by the Bulls and Bears Irrevocable Trust in each of those years. He further indicated he never stated he often worked 30 days straight for Pulmonary Associates, but that "over the years we would often cover each other's vacations or time off and I would work 12 days on and two days off, resulting in working nearly 30 days straight with only a few days off." He further stated this was a rare situation.

In addition, Cohan noted Unum's request for "[a] written statement clarifying how the income received from Pulmonary Associates in the year 2010 Form 1099-MISC reflected $211,850.00 in non-employee compensation and the total gross receipts reported from all your Schedule C businesses only totals $156,485.00." Cohan responded: "The income from 2010 - 1099 was issued to American Health Advance and it was included in the tax return for The Jobba - attached is copy of page 1 of 1065 and the corresponding statement." Cohan attached the 2010 Schedule C for Omni, (a company whose principal business Cohan had identified as Administration and Management), and which reported a gross receipt of $147,400. He also attached page 1 of Form 1065 for a partnership named

9

"The Jobba LLC," (whose principal business activity is identified as real estate investment and the principal product or service as real estate), with gross receipts of $229,966, a sheet titled "2010 Detail Statements" concerning the Form 1065, which indicated the gross receipts in the amount of $229,966 was received from American Health Advance.

In May 2012, Unum received a questionnaire response from Pulmonary Associates indicating Cohan was employed as a physician (as a 1099 contractor), working "40 plus" hours per week, and having an annual salary of $230,000 in 2010.

Unum performed several additional earnings analyses regarding Cohan's income. In each, Unum noted that only income from healthcare reported on a Schedule C was included in the calculations, and that "[p]er the definition of monthly income, this may be exceptional to the policy language."  The analysis further noted the 2010 1099-MISC for Pulmonary Associates' payment of $211,850 to Cohan, and noted the amount was not included on a 2010 Schedule C related to healthcare.  The analysis further notes Cohan's June 2012, explanation that the 1099 was issued to American Health Advance, and suggested Cohan was indicating the $211,850 was deposited into American Health Advance.  The analysis further noted that it was "unclear how the insured is involved in American Health Advance."  Nevertheless, the analysis notes Cohan's representation that the income from American Health Advance was included in the tax return for The Jobba. The gross receipts for The Jobba were $229,966, the source of which was American Health Advance, but that the complete 2010 1065 tax return was not provided.  The analysis noted that the provided form indicates the principal business of The Jobba as real estate investments, and that real estate income was being reported for this business.  The analysis notes: "Based on incomplete documentation, income related to healthcare from these entities has not been included in earned income as it is unclear how much, if any, would flow through to the insured's 2010 1040 tax return."  The analysis recommends scheduling a conference call with Cohan or his accountant to clarify the income flow.

1   Unum spoke with Cohan's accountant on October 5, 2012.  Unum's notes of the call

2   recite that the accountant "indicated on numerous occasions that all income flows through

3   Joba [sic]. . . ."  The notes further indicate that "Paula asked about the 2010 1099 and [the

4   accountant] indicated that it is his medical income," and "Paula then asked about the Sch C

5   businesses and again the accountant indicated that the Sch C companies don't make any

6   money either and everything flows through Joba [sic] LLC."

7   On November 1, 2012, Unum informed Cohan, by letter, that it was terminating Total

8   Disability benefits.  In the letter, Unum indicated its decision was based on its

9   determination that Cohan had at least two occupations at the onset of his disability,

10   identifying as occupations both critical care pulmonalogist and medical director of the

11   Vaccine Center.  The letter further indicated that Unum performed a Residual Disability

12   benefits analysis, and determined that Cohan had not suffered a loss of income in his

13   occupation as a result of his disability, and thus was not eligible for a residual disability

14   benefit.

15   Cohan did not request re-consideration of the determination and did not appeal the

16   decision.  Rather, he filed the instant lawsuit.  During discovery in this litigation, Cohan

17   produced (for the first time to Unum) a corrected Form 1099-MISC for 2010, indicating that

18   Pulmonary Associates paid American Health Advance the sum of $229,966.00.  During

19   discovery, Unum obtained, and has submitted to the Court, additional evidence regarding

20   the extent to which Cohan worked for Pulmonary Associates from 2009-2011.

21   Cohan has objected to Unum's Exhibit 42, which is a four-column table with the

22   headings "Date," "No. of Patients," "CPT Codes," and "Comments."  The exhibit further

23   indicates the table identifies the days Dr. Cohan worked for Pulmonary Associates in 2009-

24   2011.  The exhibit is attached to the declaration of Charles Danaher, in which he indicates

25   he is an attorney and partner of counsel for defendant, that he received 665 documents

26   produced by Pulmonary Associates, which documents included "Round Charts."  He further

indicates Dr. Cohan produced e-mails to Pulmonary Associates from his assistant, which e-mails indicated the days Dr. Cohan worked for Pulmonary Associates, and whether he worked a full day or a half-day.  He indicates that, based upon his review of these documents, he could determine the days Dr. Cohan worked for Pulmonary Associates, and the approximate number of patients seen.  From this information, he constructed Exhibit 42.

Dr. Cohan argues that reviewing and analyzing documents is the job of an expert (not a lawyer), and that the defendants did not designate Danaher as an expert, did not provide a timely report, and as a result Danaher was not made available for cross-examination.

Defendants respond that Danaher did not act as an expert, but merely reviewed and summarized information found within documents produced during discovery by Cohan and Pulmonary Associates.

Dr. Cohan replies that Danaher has not offered any evidence of personal knowledge of the operations of Pulmonary Associates.

The Court will not strike Exhibit 42, nor Danaher's declaration regarding that exhibit. Danaher's declaration sufficiently establishes that the information provided in Exhibit 42 is a summary of information that could otherwise be ascertained by reviewing the underlying documents that were produced by Pulmonary Associates and Cohan.

Unum also obtained, and has submitted to the court, evidence that when Cohan began working as a 1099 contractor for Pulmonary Associates, he could not work for more 80 hours in a month, and Pulmonary Associates' malpractice insurance limited Cohan to working no more than 20 hours in a week.  In 2009, Cohan worked 32 days for Pulmonary Associates.  In 2010, he worked 107 days (not all of which were full days).  In 2011, he worked 38 days (not all of which were full days) before becoming disabled.  An associate of Cohan's testified in deposition that Cohan referred to his work for Pulmonary Associates as

1  "moonlighting."  Cohan's assistant testified that she considered his work for Pulmonary

2  Associates to be a "part-time job."

3       Unum also obtained the deposition testimony of Cohan's accountant.  Concerning

4  Cohan's representations that he "materially participated" in each business for which he filed

5  a Schedule C, such representation indicated involvement in the day-to-day operation of a

6  business.  Cohan also claimed that over 21% of his house was used regularly and

7  exclusively in connection with OMNI.

8       Unum also obtained evidence, and has submitted it to the court, indicating that

9  (contrary to his prior representations to Unum) he had been a Medical Director for the

10  Vaccine Center since 2010, and had received a distribution from the Vaccine Center that

11  he re-invested in the company.  Cohan's assistant testified that, in 2010, Cohan went to the

12  Vaccine Center daily or almost daily, often using the Vaccine Center as an office where he

13  conducted meetings or interviews (rather than at his home).  Unum's Exhibits 54-60

14  indicate the extent to which Cohan was performing duties for the Vaccine Center.  Cohan's

15  assistant testified that Cohan "wanted to see what was the income being made every single

16  day at The Vaccine Center."

17       Unum also obtained evidence that Cohan started American Health Advances as a

18  business for developing and marketing a men's hair loss product.  Cohan was the CEO and

19  President, and from Sept. 2010 through June 2011, he had made several cross-country

20  trips in connection with the business.  While Cohan did not directly hire employees for

21  American Health Advances, he "did hire researchers, consultants, webpage and logo

22  designers, and contracted [with] a laboratory."

23       In her deposition, Cohan's assistant testified that in 2010 Cohan spent 30 or 40

24  percent of his working time on Windmill (a company managed through Omni), 30 or 40

25  percent of his time at the Vaccine Center, 5 to 10 percent at Pulmonary Associates, and 5

26  to 10 percent on American Health Advances.

1       The Definition of Occupation

2              Cohan asks the Court to grant partial summary judgment establishing that "[t]he

3       term 'occupation' means 'the insured's usual or principal work or profession and means of

4       making a living' and it is not a 'means of making a living' unless it made a material financial

5       contribution to the insured's pre-disability earnings."  The Court will deny Cohan's request,

6       as his proposed definition is inconsistent with the insurance policy.  The policy expressly

7       states that "your occupation means the occupation (or occupations, if more than one) in

8       which you are regularly engaged at the time you become disabled." (emphasis added).

9       While Cohan summarily asserts that his definition allows a person to have more than one

10      occupation (as required by the policy), his own citations to dictionaries and judicial

11      definitions reveal his definition is too narrow.  While an "occupation" can be a "principal

12      vocation, business or pursuit," it can also be "that which engages [a person's] attention and

13      time, [a person's] trade, vocation, or calling, [a person's] regular business or employment,

14      *or whatever [a person] follows* as the means of making a livelihood. . . ."  Even assuming

15      that a person could (as Cohan appears to suggest) regularly engage in two or more

16      "principal" professions (and thus have two or more occupations), Cohan's definition fails

17      because it limits "occupations" to those activities which are "usual or principal."  By

18      contrast, the policy limits "occupations" to those activities in which a person is regularly

19      engaged.  The Court agrees with Cohan that not "every business or activity in which the

20      insured is in some way connected is also his or her occupation."  Rather, consistent with

21      the policy, an occupation is (a) any of the broad range of activities or types of activities, or

22      synonyms for such activities that are noted in Cohan's arguments that have been variously

23      recognized as an "occupation" (trade, calling, business, vocation, profession, work, pursuit,

24      job, *whatever a persons follows as a means of making a livelihood*), (b) as to which a

25      person is "regularly engaged," and (c) with the express recognition that a person may be

26      regularly engaged in more than one occupation at a time.

14

1    Cohan's proposed definition also fails because it adds an element not required

2    under the policy: that an occupation must make a "material financial contribution to

3    earnings."  A person may engage in an occupation for the purpose of making a "material

4    financial contribution to earnings," but fail in achieving this purpose.  Whether the activity

5    was an "occupation" is not determined by the result of obtaining a "material financial

6    contribution to earnings," but by engaging in the activity for the purpose of making a

7    livelihood.  Cohan's definition improperly limits occupation based upon the result, rather

8    than the purpose, of the activity in which a person regularly engages.

9    Accordingly, Cohan is not entitled to a partial summary judgment defining

10   "occupation" as he proposes.

11   <u>Residual Disability</u>

12   Unum argues that Cohan is not entitled to residual disability benefits because "he

13   never made a residual disability claim."  Unum does not dispute that Cohan made a claim

14   for disability benefits on Unum's "Individual Disability Claim Form."  Unum does not,

15   however, direct the Court's attention to any aspect of its form that even suggests that a

16   claim made using that form (for benefits under Cohan's policy) is only for "total disability

17   benefits" and not "total or residual disability benefits."  Neither does Unum direct the

18   Court's attention to any information Cohan may have spontaneously provided on the form

19   indicating he was limiting his claim to only "total disability benefits."

20   Unum also ignores that, in response to Cohan's claim, it acted as if Cohan had

21   made a claim for residual disability benefits.  In short, Unum's own response to Cohan's

22   claim for disability benefits raises a genuine issue of material fact whether, in completing

23   and submitting Unum's claim form for disability benefits, Cohan made a claim for residual

24   disability benefits.

25

26

15

        Bad Faith and Unfair Trade Practices

        Unum argues that, pursuant to the genuine dispute doctrine, its handling of Cohan's claim cannot be considered either to have been in bad faith or an unfair trade practice.  A claim for bad faith must fail if a genuine dispute exists whether an insured is covered under a policy.  *Feldman v. Allstate Ins. Co.*, 322 F.3d 660 (9th Cir. 2003).  At issue is not whether the insured was covered under the policy, but only whether a reasonable and legitimate dispute exists as to that coverage.  In the context of the facts of the present case, the existence of a genuine dispute also requires dismissal of an unfair trade practices claim.

        In arguing that Unum is not entitled to summary judgment on his bad faith and unfair trade practices claims, Cohan ignores several undisputed facts.  As to either a claim for total or residual disability benefits, Cohan ignores that in filing his disability claim, he provided Unum with a Form 1099 showing that Pulmonary Associates paid him $211,850 directly.  He also ignores that his 2010 tax return (a) did not reflect this payment, but instead (b) reflected total gross receipts from all Schedule C businesses of $156,485.00.  He ignores that none of the Schedule C businesses included on his 2010 tax return was identified as related to the medical field.  Cohan further ignores that Unum expressly asked Cohan to clarify the discrepancy from the submitted 1099 form and his 2010 tax return.  In doing so, Unum specifically directed Cohan to the issue that Cohan had created: the Form 1099 that Cohan had submitted.  Cohan ignores that he did not direct his response to the Form 1099 that he had previously provided to Unum documenting a payment from Pulmonary Associates to Cohan in the amount of $211,850.  Rather, Cohan responded by representing (contrary to the Form 1099 at issue) that "[t]he income from 2010 - 1099 was issued to American Health Advance. . . ."  Cohan did not document a payment from Pulmonary Associates to American Health Advance.  Cohan further represented the income was included in the tax return for The Jobba, and provided a document in support of that assertion: The Jobba's tax return showing that The Jobba had received $229,966

from American Health Advance.  Cohan ignores, however, that the form he submitted to Unum showed that The Jobba's principal business concerned real estate.  Cohan did not document or explain the primary business of American Health Advance.  Cohan also ignores that Unum did not end its investigation concerning the discrepancy suggested by submitted Form 1099 and Cohan's 2010 tax return with Cohan's insufficient attempt to clarify.  Rather, Unum arranged for and conducted an hour-long telephone conference with Cohan's accountant.  In sum, the documentation submitted by Cohan indicated a discrepancy concerning Cohan's assertions as to occupation and income.  Unum engaged in a reasonable effort to clarify the discrepancy.  Cohan's responses (and those of his accountant) to Unum's efforts did not resolve the discrepancy, as they were also inconsistent with the documentation he had submitted in support of his claim.

While Cohan disagrees whether Unum obtained sufficient evidence showing that he had occupations other than a pulmonary medical doctor (the only occupation listed on his disability claim form), that disagreement does not establish the lack of genuine dispute whether he had other occupations.  By contrast, Unum has submitted sufficient evidence showing that, at a minimum, a genuine dispute existed whether Cohan had occupations other than that of a pulmonary medical doctor, and the income Cohan earned from his occupations.

Cohan's effort to avoid summary judgment on his bad faith and unfair trade practices claims by arguing that Unum failed to conduct a proper investigation prior to terminating his benefits is without merit.  Cohan does not even argue that, through additional investigation, Unum would have obtained information on "open" or "unresolved" issues that was favorable to his disability claim. .

Cohan argues that Unum's bad faith is revealed in its failure to follow its own procedures.  The argument relies heavily upon a purported copy of a 2004 Regulatory Settlement Agreement, and a purported copy of a Report of the Multistate Market Conduct

17

1   Examination dated December 31, 2007.  Unum has moved to strike the documents

2   because Cohan did not properly authenticate the documents, and because they are

3   irrelevant and constitute hearsay.

4         Cohan argues that, pursuant to Rule 901(b)(4), the documents can be self-

5   authenticated for purposes of summary judgment by review of their contents if they appear

6   sufficiently genuine.  He further argues the documents are admissible pursuant to Rule

7   803(8)901(b) as a public record, or alternatively pursuant to Rule 807 on the basis that they

8   have "equivalent circumstantial guarantees of trustworthiness."  He also argues that the

9   documents are relevant to show insurance standards that he claims the defendants

10  violated in administering his claim.

11        As noted by Unum, Cohan apparently concedes that his counsel's declaration was

12  insufficient to authenticate the documents, as he has instead argued the documents are

13  self-authenticating pursuant to Rule 901(b)(4).  However, even pursuant to Rule 901(b)(4),

14  counsel must have personal knowledge regarding the underlying document.  In short, a

15  mere declaration that an exhibit is a true and correct copy of a document, absent any

16  declaration of personal knowledge establishing the authenticity of the original document, is

17  insufficient.

18        In reviewing the arguments of Cohan in the underlying papers referencing Exhibits

19  65 and 66, the Court notes his numerous assertions regarding defendants' "prior

20  misconduct and regulatory intervention."  Assuming that Unum previously engaged in

21  misconduct and was previously subject to regulatory intervention does not render the RSA

22  relevant on the issue whether Unum engaged in misconduct in reviewing Cohan's claim.

23  The Court will strike both of Cohan's Exhibits 65 and 66.

24        Cohan also argues Unum's bad faith is demonstrated by its performance based

25  incentive program.  Unum has moved to strike the various exhibits submitted by Cohan in

26  support of his argument that Unum had an improper bonus compensation plan.  Cohan

18

refers to these documents as concerning "incentive compensation documentation."  The defendants argue the documents are irrelevant, as Cohan has not offered any evidence to show that compensation and bonuses paid to employees had any relationship to his claim or any improper financial consideration.

Cohan responds the documents reflect an incentive compensation program that rewards employees for assisting the company's bottom line, and further references the defendants' mid-1990s incentive compensation program.

The Court agrees that Cohan has not raised a triable issue of fact whether the compensation offered to Unum's employees had any relationship to their handling of his claim.  As such, the documents concerning compensation paid to Unum's employees are not relevant and the Court will strike the exhibits.

In sum, Cohan initiated his disability claim by reporting a single occupation (pulmonary care medical doctor) in which he worked more than 40 hours each week, and earned $211,850.00.  He documented the salary by attaching a Form 1099, indicating he received (as a non-employee) $211,850 from Pulmonary Associates.  Unum's investigation after re-opening his claim (at Cohan's request) revealed several issues creating genuine disputes as to whether Cohan was entitled to either total or residual benefits under the policy.  Accordingly, Unum is entitled to partial summary judgment as to Cohan's claims for bad faith and unfair trade practices.

<u>Punitive Damages</u>

For substantially the same reasons that Cohan cannot maintain his claims for bad faith and unfair trade practices, he cannot obtain punitive damages in the circumstances of this case.

<u>Breach of Contract</u>

Unum is correct that, at a minimum, a genuine dispute existed regarding Cohan's occupation or occupations and his income at the time it terminated his benefits.  The

1   additional evidence subsequently obtained by Unum during discovery, and submitted to the

2   Court, certainly suggests Unum was correct that Cohan had occupations in addition to

3   being a "pulmonary critical care physician."  The undisputed evidence presented to the

4   Court indicates that both Cohan and Pulmonary Associates over-stated the number of

5   hours that Cohan could have worked, or actually worked, each week for Pulmonary

6   Associates after April of 2009.  The undisputed evidence submitted to the Court indicates

7   that Cohan's activities for the Vaccine Center prior to June 2011 were greater than he

8   represented to Unum during the investigation of his claim.  The undisputed evidence

9   submitted to the Court indicates that Cohan has represented to the federal government that

10  he "materially participated" in several businesses unrelated to his profession as a

11  "pulmonary critical care physician.  The evidence also indicates that Cohan's involvement

12  in both the Vaccine Center and his other businesses may have been equal to or greater

13  than that devoted to his profession as a critical care pulmonary physician.  That the

14  evidence indicates Unum was correct in determining that Cohan had additional occupations

15  does not, however, establish that these are not triable issues.

16      Conversely, while Cohan has now produced additional evidence relevant to Unum's

17  calculation of his residual disability benefit, and while he now relies upon that additional

18  evidence to suggest that Unum's calculation was incorrect, triable issues remain as to the

19  correct calculation.

20      As argued by Unum in seeking relief from Cohan's claims for bad faith and unfair

21  practices, genuine disputes remain whether Cohan is entitled to either total or residual

22  benefits.  Accordingly, the Court will deny Unum's motion as to Cohan's breach of contract

23  claim, and Cohan's request for a determination that Unum incorrectly calculated his

24  eligibility for residual benefits.

25      Therefore, for good cause shown,

26

THE COURT **ORDERS** that Jonathan Cohan, M.D.'s Motion to Strike (#190) is GRANTED in part and DENIED in part as set forth above;

THE COURT FURTHER **ORDERS** that Defendants' Motion to Strike (#194) is DENIED as moot;

THE COURT FURTHER **ORDERS** that Defendants' Motion to Strike (#218) is GRANTED in part and DENIED in part as set forth above;

THE COURT FURTHER **ORDERS** that Jonathan Cohan, M.D.'s Motion for Partial Summary Judgment (#135) is DENIED;

THE COURT FURTHER **ORDERS** that Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (#138) is GRANTED as to Jonathan Cohan, M.D.'s Second Claim for Bad Faith and Third Claim for Unfair Trade Practices, and is GRANTED as to Jonathan Cohan M.D.'s prayer for Punitive Damages, and is DENIED as to Jonathan Cohan's First Claim for Breach of Contract.

DATED this __30__ day of September, 2015.

_____
Lloyd D. George
United States District Judge

21